UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Newport News Division

UNITED STATES OF AMERICA,

v.                                                      CRIMINAL NO. 4:13cr26

RYAN CHRISTOPHER FULTZ,

　　　　　Defendant.

## OPINION AND ORDER

This matter is before the Court on Defendant Ryan Christopher Fultz's ("Defendant" or

"Fultz") Motion for New Trial, Doc. 81. ("Motion"). For the reasons explained herein,

Defendant's Motion is **DENIED**.

## I.   FACTUAL AND PROCEDURAL HISTORY

Defendant was named in a three-count Indictment, charging him with: (1) possession

with intent to distribute cocaine base, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(c); (2)

possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C.

§ 924(c)(1); and (3) being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g).

Doc. 1. The charges were made in connection with a shooting that occurred in the parking lot of

a Wal-Mart in Hampton, Virginia on December 27, 2011. Defendant was identified as a suspect,

but was not arrested until December 2, 2012. Defendant made his initial appearance on

September 26, 2013, where he entered a plea of not guilty, and demanded trial by jury. Doc. 12.

Trial commenced on February 4, 2014.

The evidence presented during the trial consisted of physical evidence recovered from the

Wal-Mart parking lot ("Primary Crime Scene"), surveillance video from the Wal-Mart, evidence

1

from the vehicles involved in the shooting recovered at secondary crime scenes, and testimony from Defendant's alleged co-conspirators.  The following physical evidence was recovered at the Primary Crime Scene: eleven (11) nine millimeter (9mm) bullet casings, nine (9) .357 casings, three (3) .223 casings, various bullet fragments, a nine millimeter (9mm) handgun, and a .45 caliber handgun.  The cars that were involved in the shooting, a silver Dodge Charger ("Charger") and a green Ford Taurus ("Taurus"), were recovered that night at secondary crime scenes and processed by the same technician that processed the Primary Crime Scene.  A fourth .223 casing was recovered inside the front passenger side of the Charger, near the doorjamb.

The Government created diagrams showing the relative positions of the vehicles involved and the physical evidence recovered from the Primary Crime Scene.[1]  See Gov't Exs. 1, 1A, 2. The Charger was parked closer to the Wal-Mart; looking from the Wal-Mart, a van was parked to the left of the Charger and there was a tree to the right.  See Gov't Ex. 1A; Def. Ex. 1.  The Taurus was parked in the row immediately across from the Charger, one parking spot to the right of the Charger.  Id.  As shown on the surveillance video, the shooting began at around 5:26 p.m. Def. Ex. 1.  The surveillance video then shows Defendant fleeing from the parking lot towards the Wal-Mart entrance.  Id.  Shooting continued, and the Taurus left the scene about one minute later.  Id.  At around 5:30 p.m., Defendant left the Wal-Mart, re-entered the Charger, and the Charger left the scene.  Id.  Hampton Police then arrived at approximately 5:33 p.m.  Id.

The Government offered the testimony of Defendant's alleged co-conspirators to establish that Defendant was the shooter of the rifle, identified as a Bushmaster AR15 ("Bushmaster"), that discharged the .223 casings.  Robert Murphy ("Murphy") and Christopher Vinson ("Vinson") testified that they arrived at the Wal-Mart in the Taurus.  David Andrews

---

[1] Copies of the diagrams have been attached at the end of this opinion.

("Andrews") testified that he, Randall Woods ("Woods") and Defendant arrived in the Charger. Murphy testified that he saw Defendant firing a rifle out of the passenger side of the Charger. Murphy further testified that he drove away as soon as Defendant fired a shot that shattered the front windshield of the Taurus. Vinson testified that he fired shots from a 9mm gun. Vinson, while unable to identify who was shooting out of the passenger side, corroborated Murphy's statement by testifying that he too saw a person shooting out of the passenger side of the Charger.[2] Andrews testified that he used a .357 Glock, and that he disposed of the gun behind a Target store. Andrews also testified that Fultz had the Bushmaster in his possession, and was on the front passenger side of the Charger at the time of the shooting. Andrews further testified that Fultz fired the Bushmaster from the passenger side of the Charger towards the passenger side of the Taurus, and that one of his shots went through the windshield of the Taurus.

Of the three .223 casings found at the Primary Crime scene, two were found in the parking space vacated by the Charger (on what would have been the passenger side of the Charger), while the third was found in front of the van (on what would have been near the driver's side of the Charger). See Doc. 2. A fourth was recovered from the front passenger side of the interior of the Charger. The Government's experts William Banks and Courtney Etzelmiller, as well as Defendant's proffered expert Carl Rone, agreed that the Bushmaster was the only weapon identified as being at the scene which used .223 caliber ammunition.

On February 5, 2014, the Government rested its case. After the jury was dismissed, defense counsel indicated her desire to open her case with the testimony of Mr. Rone, Defendant's firearms, ballistics, and shooting scene reconstruction expert. The Court had

---

[2] Vinson also testified that Andrews and Woods were near the Taurus, so that it could not have been those two who were firing from the Charger, and he described the individual as wearing a gray, burgundy, and white jacket, consistent with what Fultz was wearing, as can be seen on the Wal-Mart surveillance video. See Def. Ex. 1.

previously reviewed defense counsel's Notice of Expert Opinion Testimony ("Notice"), Doc. 39,

regarding the admissibility of Rone's expert testimony as to the location of the shooter of the

Bushmaster. The Court advised counsel that it foresaw problems with the admissibility of

portions of the potential expert testimony. Accordingly, defense counsel was given the

opportunity to proffer the proposed expert opinion testimony. Defense counsel presented the

Court with the Notice and Mr. Rone took the stand out of the presence of the jury.

The Court assumed, for purposes of the proffer, that Rone was qualified as an expert in

the areas of firearms identification, ballistics, and shooting scene reconstruction.[3] The Court

then focused its inquiry on the scientific, technological, and evidentiary basis for Rone's opinion

on the location of the Bushmaster shooter. Rone's testimony was vague; however, the Court

understood Rone to be offering two opinions on the location of the Bushmaster shooter. First,

Rone opined that the Bushmaster shooter was likely standing in front of the Charger.[4] To arrive

at this conclusion, Rone assumed the spent .223 casings had traveled in a standard ejection

pattern (right and to the rear) from an AR15 held in a normal shooting position.[5] Alternatively,

Rone opined that it was possible that the Bushmaster shooter was near the passenger side of the

Taurus. Def. Ex. 21 at 2–3. According to Rone, this conclusion was possible if the .223 casings

were ejected in a forward pattern, and was based on viewing what appear to be muzzle flashes in

the surveillance video. Id. His support for this theory relied on information he found in an

---

[3] Mr. Rone's qualifications are set forth in a twenty-four (24) page curriculum vitae ("CV"). Doc. 39-1.
[4] While on the stand, Rone did not indicate precisely where in front of the Charger the .223 shooter was standing, nor did he provide consistent information on the distance an ejected casing can travel, despite being asked by the Court.
[5] However, Rone noted that any number of factors could change the normal ejection pattern of a firearm, including a shooter's stance (position), as well as whether the ejection mechanism of the firearm was altered or damaged. See Def. Ex. 21 at 2 (basing the opinion on the assumption of a standard ejection pattern and normal shooting position). Testimony from Murphy indicated that saw the Defendant firing from the Charger in a "normal shooting position."

Internet chat room. Rone testified that he did not have the actual Bushmaster, nor had he visited the Primary Crime Scene.[6]

After reviewing the Notice and completing its inquiry, the Court made an initial determination that Rone's proffered opinion testimony was inadmissible. The Court found that the proffered opinion was not supported by scientific theory or technical evidence, and that there was no factual basis to support his opinion that Defendant was not the shooter of the Bushmaster based upon his opinion of the location of the shooter. Defense counsel argued that the Court's ruling went to the credibility of the opinion, rather than its admissibility; and the Court permitted Defendant to submit additional briefing and evidence on the subject the following morning. Defense counsel filed a Memorandum, Doc. 70, and submitted Rone's expert report, which was admitted for identification purposes only as Defense Exhibit 21. On February 6, 2014, Rone took the stand again to answer the Court's questions regarding the validity of the methodology he employed in his forensic analysis. The Court found the additional evidence proffered insufficient to render Rone's proposed opinion testimony on the shooter's location reliable, and ruling from the bench, excluded Rone from offering an expert opinion on the location of the Bushmaster shooter.

A jury returned a verdict of guilty on February 7, 2014. Doc. 75. Defendant filed his Motion for New Trial on February 21, 2014. Doc. 81. Defendant filed a Letter from his counsel

---

[6] Andrews testified that the Bushmaster was his weapon, and that Defendant wanted to possess it because he was "riding" around with Andrews and Woods, who were engaging in drug transactions. Andrews testified that the Bushmaster was in Defendant's possession when the shooting began at the Wal-Mart. Andrews also testified that after the shooting, Woods and Fultz arrived at the Best Western hotel in the Charger, and from there they proceeded to the house of Defendant's female cousin, where they left the Bushmaster. The Bushmaster was never recovered, and thus not introduced into evidence. However, it was sufficiently described by the testimony of the witnesses, and it was agreed that it was the only weapon identified as being at the scene that ejected .223 casings. The Government introduced an exhibit containing a description and a picture of a Bushmaster. See Gov't Ex. 58. Andrews testified that the weapon shown in that exhibit was the same type as the Bushmaster used in the shooting.

on March 21, 2014, without leave of court, providing the Court with additional authority in

support of his Motion. Doc. 87. The Government filed an untimely Response to Defendant's

Motion on March 25, 2014. Doc. 89. In an Order dated March 26, 2014, the Court granted leave

for the Government to file its response, and granted leave for Defendant to file his letter,

construing it as a request to file a supplemental brief in support of his Motion. Doc. 90. The

Defendant filed a Reply to the Government's Response on March 28, 2014. Doc. 91. The

Government filed its Response to Defendant's supplemental brief on April 7, 2014. Doc. 92.

## II.    LEGAL STANDARDS

Federal Rule of Criminal Procedure Rule 33 provides that a "court may vacate any

judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a).

There are two grounds for granting a motion:  on the grounds of "newly discovered evidence" or

"any reason other than newly discovered evidence." Id. 33(b).

Five elements must be established to grant a motion for new trial based on new evidence:

> (a) the evidence must be, in fact, newly discovered, i.e., discovered
> since the trial; (b) facts must be alleged from which the court may
> infer diligence on the part of the movant; (c) the evidence relied on
> must not be merely cumulative or impeaching; (d) it must be
> material to the issues involved; and (e) it must be such, and of such
> nature, as that, on a new trial, the newly discovered evidence
> would probably produce an acquittal.

United States v. Fulcher, 250 F.3d 244, 249 (4th Cir. 2001) (quoting United States v. Custis, 988

F.2d 1355, 1359 (4th Cir. 1989)). Newly discovered evidence need not pertain directly to guilt

or innocence, but can be probative of another issue of law. United States v. Campa, 459 F.3d

1121, 1151 (11th Cir. 2006).

The power to grant a new trial based on the "interest of justice" standard should be used

"where it is demonstrated that the fundamental fairness or integrity of the trial result is

substantially in doubt." United States v. Jennings, 438 F. Supp. 2d 637, 642 (E.D. Va. 2006). There is "a strong interest in ensuring that convictions are not allowed to stand if infected by, or based on, an incorrect application of the governing law." Id. The power to grant a new trial should be used sparingly. Id. (citing United States v. Arrington, 757 F.2d 1484, 1486 (4th Cir. 1985)).

## III.  ANALYSIS

Defendant sought to admit the opinion testimony of Mr. Rone, a self-described expert in firearms examination, ballistics, and shooting scene reconstruction.[7] Defendant argues that his Motion should be granted because there was newly discovered evidence in the form of additional scientific literature to support Mr. Rone's opinion on the shooter's location.[8] Doc. 81 at 8. Alternatively, Defendant argues that the "other grounds" basis exists to grant a new trial, because "the defense was prejudicially limited by the Court's failure to allow him to treat Mr. Rone as a Shooting Incident Reconstruction expert ...." Id. The Government argues that Defendant's literature is not "newly discovered evidence of any probative value that [would] result in an acquittal at trial [and] the defendant was not prejudiced by the exclusion of Mr. Rone." Doc. 89 at 9. The Court addresses each ground presented by Defendant in turn.

---

[7] Mr. Rone has an associate degree in applied science (accounting) from the Community College of Philadelphia, and more than three decades combined experience in law enforcement and firearms identification. Doc. 39-1. In November 2006, Mr. Rone helped establish the Delaware State Police Forensic Firearms Services Unit ("FFSU"), where he currently serves as a certified forensic firearms examiner, offering services such as firearm serial number restoration, gunshot residue testing, bullet trajectory work, and tool mark examinations to investigative agencies in Delaware. Id. Rone's training in shooting scene reconstruction includes two week-long seminars in 2003 and 2004, and daylong seminars in 2006 and 2008. Id. at 13–15. Rone indicated that he had significant experience testifying in state court, though he did not recall whether he had offered opinion testimony in court on the location of a shooter using the location of ejected shell casings. Nevertheless, as noted above, the Court assumed, for the purposes of its Daubert challenge, that Rone was sufficiently qualified to testify as an expert on firearms, ballistics, and shooting scene reconstruction in the instant action. The Court questioned, however, the reliability of the proposed expert opinion, specifically with regard to the methodology used to arrive at the conclusion that Defendant was not the .223 shooter.
[8] Attached to his Motion, the Defendant attaches a "Non-Exhaustive List of References for Shooting Incident Reconstruction and Shell Casing Information." Doc. 81-1.

### a. **Newly Discovered Evidence**

Defendant argues that the additional literature supporting Mr. Rone's proposed testimony qualifies as newly discovered evidence. However, Defendant cannot establish, at the very least, two of the five factors required to grant a new trial on this ground because Defendant does not allege facts showing diligence, nor would the evidence probably produce an acquittal.

In <u>United States v. Nicholson</u>, 32 F. Supp. 2d 849, 850 (E.D. Va. 1998), the defendant was convicted of driving after being declared a habitual offender. The defendant then moved the court for a new trial on the grounds of newly discovered evidence when he presented a state court order entered six days after the conclusion of his federal trial. <u>Id.</u> at 852. This Court denied his motion, because "<u>all</u> of the material underlying the ... order ... was in existence prior to the date of the defendant's trial." <u>Id.</u> at 853 (emphasis in the original).

Likewise, all of the expert materials presented by Defendant in his Motion existed before the trial. <u>See</u> Doc. 81-1 (containing a listing of nine authorities for the Court to consider, all of which were available before the Court excluded Mr. Rone's testimony). While defense counsel did not have these sources in hand at the time of trial, Defendant was put on notice on February 5 that the Court was concerned about the admissibility of Mr. Rone's testimony, and the Court asked Defendant to submit a memorandum on the admissibility of his testimony. While Defendant states that there was no computer access in the courtroom on February 6, Defendant has not given the Court any reason why these sources could not have been provided in its February 6 Memorandum or could not have been provided to the Court prior to the trial in Rone's CV, given that all of the materials were in existence at that time.

Furthermore, even if Defendant had used due diligence in finding these materials, Defendant cannot show that they would probably result in an acquittal.[9]  The Court is required to make a credibility determination, weighing all of the evidence in the record, considering whether a jury probably would reach a different result after hearing the new evidence.  United States v. Wilson, 624 F.3d 640, 663 (4th Cir. 2010); United States v. Lighty, 616 F.3d 321, 374 (4th Cir. 2010).  In his written report, defense counsel's filing, and during his proffer, Mr. Rone offered several opinions on the location of the shooter that conflicted with the testimony of several of the Government's witnesses, was internally inconsistent, as well as inconsistent with his testimony regarding the standard shell ejection pattern for a Bushmaster.  As discussed above, three witnesses provided testimony that conflicted with Rone's proposed opinion that Defendant was not the shooter.  Allowing Mr. Rone's testimony would have simply provided a competing viewpoint with these three witnesses,[10] and given the Court's concerns about the scientific and technological methodology used by Mr. Rone, the Court cannot say the inclusion of Mr. Rone's testimony would probably result in an acquittal at a new trial.  See, e.g., Wilson, 624 F.3d 640, 665 (4th Cir. 2010) (finding the district court did not abuse its discretion in denying a motion for new trial when it "considered all of the trial evidence" and found the proffered evidence to not be credible); United States v. Belyea, 159 F. App'x 532, 533 (4th Cir. 2005) (finding a new trial warranted where the new evidence so marginalized and overshadowed the Government's evidence "that it would likely raise reasonable doubt in jurors' minds that Belyea ever possessed the guns"); United States v. Lopez-Escobar, 920 F.2d 1241, 1246–47 (5th Cir. 1991) (newly

---

[9] It appears that Defendant is assuming that the Court would have admitted Mr. Rone's testimony if the additional literature would have been offered.  As discussed below, the lack of scientific support for his testimony was only one such concern that the Court had concerning his proposed testimony.

[10] Defendant concedes that all Mr. Rone could provide was an opinion.  Doc. 91 at 4.

discovered shell casings not likely to lead to acquittal when it would merely impeach two eyewitnesses and defendant's account was implausible).

Moreover, based on the testimony of the witnesses, the jury could have also found that Rone's theory would place the shooter of the Bushmaster where Fultz was placed by the witnesses' testimony, as Fultz would have likely had to shoot at an angle to target the passenger side of the Taurus, leading the casings to fall to the "right and rear" as they were found at the Primary Crime Scene. See Gov't Exs. 1A, 2. Additionally, the one casing found in the Charger would be consistent with Fultz shooting from the passenger side of the Charger as it would have been to the right and rear if he was shooting as described by the witness testimony. Accordingly, the Motion is **DENIED** on the grounds of newly discovered evidence.

### b.  "Other Grounds"—Failure to Admit Defendant's Expert to Testify as a Shooting Reconstruction Expert

Defendant also moves the Court to grant a new trial on the grounds that the interest of justice requires a new trial because of the Court's failure to admit Mr. Rone as a shooting incident reconstruction expert, even without considering the above-stated evidence. Doc. 81 at 8.

The standards governing the admissibility of expert testimony are well-established. Under Federal Rule of Evidence 702, a qualified expert may present opinion testimony if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Put another way, a trial judge faced with a proffer of expert scientific or technical testimony must determine "whether the expert is proposing to testify to (1) scientific

10

knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 592 (1993). This inquiry requires the court to assess "whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." Id. at 592–93. The district court has broad discretion in determining how to resolve a Daubert challenge. United States v. Beasley, 495 F.3d 142, 150 (4th Cir. 2007) (quoting Kumho Tire Co. v. Carmichael, 526 U.S. 137, 142 (1999)).

The Supreme Court identified four factors to assist judges in undertaking this assessment, though they cautioned that their list was neither exhaustive nor definitive. Daubert, 509 U.S. at 593. In evaluating the reliability of expert opinion evidence, a court should consider: (1) whether the theory or technique used by the expert can, and has been tested; (2) "whether the theory or technique has been subjected to peer review and publication;" (3) "the known or potential rate of error" of the technique or method used; and (4) the degree of the method's or conclusion's general acceptance within the relevant scientific community. Id. at 593–94. The proponent of the evidence bears a significant burden in proving reliability; a proffer of expert testimony must include the substantive area of the proposed testimony, as well as "'sufficient information regarding the bases for the expert's opinion.'" United States v. Lester, 234 F. Supp. 2d 595, 598 (E.D. Va. 2002) (quoting United States v. Jordan, 924 F. Supp. 443, 447 (W.D.N.Y. 1996)). "Where the proponent of the testimony fails to present enough evidence to demonstrate to the court the scientific validity of the research supporting the expert's conclusions, the trial court cannot determine whether the testimony is well-founded." Lester, 234 F. Supp. 2d at 598.

If allowed to testify at trial, Rone would have offered two opinions on the locations of the shooter of the firearm that ejected the .223 casings found at the crime scenes. After reviewing

11

co-conspirators' statements, the ballistics report, the Wal-Mart surveillance video, crime scene

photos and diagrams, and conducting forensic analysis, Rone first opined that

> [b]ased on the position of the fired cartridge cases and not having the firearm and assuming that the ejection pattern of the .223 firearm is to the right and the rear (as a standard and if the firearm was held in a correct shooting position) that would place the shooter in the front and leftward of the blue van.

Def. Ex. 21 at 2.

Rone testified that if the Bushmaster had ejected casings in a forward position, as he saw

discussed in an Internet chat room, it would be possible for the shooter to have been near the

passenger side of the Taurus.  In his report, Rone offered the following "professional opinion"

regarding the shooter's location that conflicted with this testimony:

> [i]t should also be noted again that you have several muzzle flashes which appear to be coming from the passenger's side of the Taurus it is a possibility this could be the .223 caliber weapon.  Sense [sic] the direction and shooting position of the weapon can't be determined and through some research it was discovered that there are some .223 caliber weapons that eject forward and a good distance with the car moving this might be could be [sic] a contributing factor to the caseing [sic] being where there [sic] are recovered if indeed the muzzle flashes are that of the .223 caliber firearm.[11]

Def. Ex. 21 at 2–3.  Each of these locations were inconsistent with co-conspirators' testimony as

to where Defendant was standing during the shooting, and were part of three alternative locations

Rone opined might have been the location of the shooter.[12]

---

[11] His testimony did not mention anything about a .223 caliber weapon having to be fired from a moving vehicle to cause the casings to eject forward, and thus the Court understood Rone to offer two different theories regarding the location of the shooter relative to the Taurus.

[12] Although not stated in his report, Mr. Rone testified that, based on his theory, it would also have been possible for the casings to have landed in their locations if the shooter was on the passenger side of the Charger and the Bushmaster was "Not [fired] in a normal shooting position."

Here, it appears that none of the factors indicating reliability are present in Rone's expert report or his proffered expert testimony. Daubert, 509 U.S. at 593–94. Both Rone's report and his proffered testimony were devoid of any explanation of the methodology used or the research Rone relied upon to reach his conclusions. Def. Ex. 21. Rone's conclusions relied on two "theories" for pinpointing the location of a shooter based on the location of spent casings: the first assumed a standard ejection pattern (right and to the rear) and normal shooting position, while the second relied on anecdotal "evidence" of .223 caliber weapons that may eject casings forward and the third relied on the fact that he saw muzzle flashes on the surveillance video near the Taurus as Murphy drove away. Id. Neither theory can explain how two of the casings ended up on the passenger side of the Charger, while one of the casings ended up on the driver's side of the Charger.

Rone further testified that a number of factors could "change the normal ejection pattern of the firearm" and he did not have the actual firearm, or any other evidence, to determine if the Bushmaster had such alterations. Moreover, Rone did not indicate at trial whether a method for determining the origin of a gunshot from the location of spent casings has been (or can be) tested, nor did he indicate whether such a method has been subjected to peer review and publication.[13] Daubert, 509 U.S. at 593. When asked whether there was any literature supporting the theory that one could determine the origin of a shot based on the location of shell

---

[13] In his Motion, Defendant did provide the Court one peer-reviewed study that supports Rone's description of casings being ejected to the right and rear. Michael Haag et al., Ejection Patterning—Standard Testing and the Effects of Non-Standard Angles, Orientations, and Maneuvers, 41 AFTE J. 111 (Spring 2009). However, this study cautioned readers about its results. Id. at 129 ("The examiner, investigator, or attorney who believes that testing of this type will provide specific location of a firearm down to an inch is incorrect. The accuracy of the firearm location may be approximately 5 feet, 20 feet, or greater depending on the results of the firings with the actual firearm in question."). Again, Rone did not have the actual firearm in offering his proposed opinion.

13

casings at a crime scene, Rone was evasive.[14] See United States v. Semrau, 693 F.3d 510, 522

(6th Cir. 2012) (upholding the district court's exclusion of an expert witness in part on the basis

that "no formal research" was presented at the Daubert hearing).

Additionally, the report and proffered testimony were silent on the known or potential

error rate of Rone's chosen method of determining shooter location, and did not indicate whether

the method is generally accepted in the forensic/investigative scientific community. Daubert,

509 U.S. at 594. Rone was evasive when the Court inquired into how far an ejected shell casing

could travel; his report did not state how far a casing can travel, and he testified at one point that

they "go at least 10 to 12 feet," estimated they may travel a few feet at another, and finally

testified to the jury that "different brands of ammunition may eject slightly different and go

different distances." Rone's report and proffered testimony appear to contain only conjecture

and conclusions. Defendant failed to meet his burden of proffering sufficient information on the

scientific or technological basis of his expert opinion. Lester, 234 F. Supp. 2d at 598. Without

this information, the Court was unable to assess the scientific validity of Rone's conclusions.[15]

---

[14] Mr. Rone mentioned that spent casings were discussed at a seminar he attended in 2004, but he could not supply any definitive explanation of what was discussed or supply any literature on the subject, nor could he cite any case in which he was permitted to testify as an expert on determining a shooter's location based on the location of spent shell casings, nor has counsel cited any case where such testimony has been admitted. The Court conducted its own search for literature supporting Rone's theory and uncovered a study that concluded that "determining shooter location from the spent cartridge case alone leads to only a tentative estimate of the shooter's location." William J. Lewinski, Ph.D, et al., Fired Cartridge Case Ejection Patterns from Semi-Automatic Firearms, Investigative Sci. J., Nov. 2010, available at http://www.investigativesciencesjournal.org/article/view/7104 (last visited Feb. 27, 2014). The Court also found literature supporting the proposition that case ejections, when combined with bullet trajectory projections, can allow one to determine "the place from which the shots were fired ... with a high degree of probability." George Schiro, Shooting Reconstruction—When the Bullet Hits the Bone, S. Lawman Mag. (Fall 1998), available at http://www.forensicscienceresources.com/Shooting.htm (last visited March 31, 2014); see also Robert R. Ogle, Jr., Crime Scene Investigation & Reconstruction 393 (3d ed. 2012) ("Data from the location of the expended cartridge cases, coupled with the data from trajectory analysis and the identification of the weapon that fired each bullet, will provide much of the information needed for reconstruction of the incident."). Rone's report contained no mention of performing a trajectory analysis. See Def. Ex. 21.

[15] As discussed above, the Court does not believe it is proper to consider the additional scientific literature provided by Defendant because it does not qualify under the new evidence grounds of Federal Rule of Criminal Procedure 33. However, even if the Court were to consider the additional literature, it would not be sufficient to change the Court's

Id.; see also Baker v. State, 668 S.E.2d 716, 717–718 (Ga. 2008) (finding in rejecting the defendant's challenge that the evidence was insufficient to support his conviction, that the use of ejected shell casings to determine shooter location was unreliable and could not be used to show that the defendant was not the shooter).

In addition to excluding Rone's opinion testimony as to the shooter's location because of his failure to demonstrate that the use of casing ejection patterns was a scientifically valid means of pinpointing the location of a shooter, the Court also found Rone's reliance on evidence collected from a compromised crime scene was misplaced. Given the undisputed testimony that at least three individuals ran through the crime scene, and the cars involved left the scene before the Government's crime scene technician surveyed it, Rone had insufficient information to determine whether the location where any of the .223 shell casings were found by the crime scene technician is actually where they were when they were initially ejected from the .223 caliber firearm. Furthermore, one casing was found in the Charger, and muzzle flashes in the video indicate that there was a high probability that the casings found bounced off the cars at the crime scene.[16] Moreover, testimony established that the crime scene technician did not take

---

decision, as the literature is rife with references to the uncertainty surrounding this field. For example, one of the sources provided by Defendant in support of his Motion states that "'we can often state with reasonable certainty where the [firearms] were not fired. The same would hold true for fully automatic firearms.'" Doc. 87 at 1 (quoting Lucien C. Haag, Shooting Incident Reconstruction 221–22 (1st ed. 2005)). "Reasonable certainty" is not the same as providing the Court a known or potential error rate. Furthermore, the Defendant's other sources undermine his position, noting that the final location of extracted casings "will confirm virtually nothing about a shooter's firing position unless you know how he was holding his gun and how he was moving at the time of discharge. By changing those characteristics, you can place shells all over the place." Force Sci. Research Ctr., New Findings on Shell Ejection Patterns Help Clear Officer on Trial for Murder (Dec. 7, 2004), http://www.policeone.com/officer-shootings/articles/94341-New-findings-on-shell-ejection-patterns-help-clear-officer-on-trial-for-murder; see also Ross M. Gardner, Practical Crime Scene Processing and Investigation 50 (2d ed. 2012) (noting that ejection pattern studies "often have limited value since the casings ejected from the weapon will roll when they hit the ground or ricochet off walls or other objects."). Finally, the literature also admits that "the interpretation of cartridge casing location and ejection is fraught with the greatest uncertainty." Michael G. Haag and Lucien C. Haag, Shooting Incident Reconstruction 262 (2d ed. 2011).

[16] Rone admitted that if a casing struck an object, it could "go in any which way."

15

measurements of, nor did Rone visit, the Primary Crime Scene. Additionally, neither the crime scene technician nor Rone attempted to do a trajectory analysis of the scene, as the participants removed the vehicles before the police could arrive. There is insufficient evidence to support a shooting scene reconstruction based upon the location of the spent .223 casings.[17]

Finally, the Court found Rone's proffered opinion testimony did not assist the jury in understanding the evidence or determining a fact at issue because it offered three polar opposite alternate conclusions as to the location of the shooter, none of the conclusions were stated with any degree of certainty, and Rone could not state with any degree of certainty that Defendant was not the shooter of the Bushmaster rifle. See Def. Ex. 21 at 2–3. Furthermore, Rone attempted to testify that Defendant entered the Wal-Mart before shots began, which was not supported by the surveillance video or the testimony of any of the other participants. Indeed, Rone's opinion that the .223 shots may have originated from the passenger side of the Taurus is inconsistent with his testimony that the ejection pattern of a Bushmaster is a few feet and to the right and rear, as well as his fleeing car theory.

In summary, after accepting Rone's qualifications, and reviewing the expert report, defense counsel's summary of his report, and proffered expert opinion testimony (offered on February 5-6, 2014), the Court found that Rone provided insufficient information on the methodology he used to reach his opinion on the location of the Bushmaster shooter as well as insufficient evidence and no degree of the probability of his findings to support the reliability of his opinion. Further, the reliability of the Primary Crime Scene had been compromised by the

---

[17] The additional sources that Defendant asked the Court to consider support this very conclusion. See Dean H. Garrison, Jr., Practical Shooting Scene Investigation: The Investigation & Reconstruction of Crime Scenes Involving Gunfire 61 (2003) ("After the shooting, other vehicle traffic or an overly curious crowd can move the cases around and warp the data."); Haag & Haag, supra, at 247 ("Post-ejection events must be considered prior to any interpretation of the location of a recovered cartridge casing.").

movement of the participants and vehicles.  Accordingly, the Court excluded that portion of

Rone's opinion testimony which related to the position of the Bushmaster shooter based upon the

location of the .223 casings shown in Government Exhibit 2 attached.  The Court adheres to its

prior ruling, and thus Defendant's Motion, Doc. 81, is **DENIED**.

## IV.    CONCLUSION

For the reasons stated herein, Defendant's Motion for New Trial, Doc. 81, is **DENIED.**

The Clerk is **REQUESTED** to mail a copy of this Order to all counsel of record.

**IT IS SO ORDERED.**

/s/
Henry Coke Morgan, **Jr.**
Senior United States District Judge
HENRY COKE MORGAN, JR.
SENIOR UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
May 9 , 2014

17

**ATTACHMENTS**



11-1227030-POSITION OF VEHICLES DIAGRAM

+++DIAGRAM NOT TO SCALE+++++

GOVERNMENT EXHIBIT

4:12cr24



VAN

CHARGER

MAZDA

TAURUS

WHITE OLDSMOBILE

11-1227030-POSITION OF VEHICLES DIAGRAM

+++DIAGRAM NOT TO SCALE+++++

GOVERNMENT
EXHIBIT
A
4:12cr24



11-1227030-CASINGS AND BULLETS DIAGRAM
+++DIAGRAM NOT SCALE++++